**IN THE UNITED STATE DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| PATRICIA ALBARADO; | § | |
| ERICA BARRERA, Individually | § | |
| and ANF of D.R., Minor, | § | |
| MICHAEL BROWN, Individually | § | |
| And ANF of V.B., Minor, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 5:24-cv-00756 |
| UNITED PARCEL SERVICE, INC. | § | |
| A.K.A. and DBA as UPS; | § | |
| FEDEX CORPORATION | § | |
| A.K.A. and DBA as FedEx, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

---

### DEFENDANT UNITED PARCEL SERVICE, INC.'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT WITH PREJUDICE

---

### INTRODUCTION

United Parcel Service, Inc. ("UPS") is deeply sympathetic to Plaintiffs and every victim of the attack at Robb Elementary School. UPS, however, is not responsible for the attack or its resulting harm. UPS thus respectfully seeks an order dismissing all of Plaintiffs' claims.

Based on "information and belief," Plaintiffs allege that UPS transported a "trigger device" that the attacker allegedly purchased—but may not have used—to increase a rifle's rate of fire. Plaintiffs do not contend UPS had any relationship with the attacker, much less that UPS had any reason to suspect his plans. Plaintiffs do not even allege that UPS knew or had any reason to know that it was transporting a trigger device. Nor do Plaintiffs plausibly allege that the sender of the

package broke any law by using UPS to transport it, let alone that UPS broke a law if it accepted the package. Rather, Plaintiffs assert state law negligence and intentional infliction of emotional distress claims against UPS, claiming that UPS has a duty to screen package contents and to protect the public against their use in the commission of a future crime. Plaintiffs contend that UPS, and all carriers like it, must inspect every package they carry and evaluate its potential to harm third parties, including by investigating the age, mental health, and intentions of package recipients. The law does not support such a broad application of tort liability against a motor carrier like UPS, and in fact federal law precludes the application of state law to impose such obligations on carriers.

Plaintiffs' claims warrant dismissal for two independent reasons. First, Plaintiffs rely on state law to dictate the manner in which UPS must perform the transportation service it provides. As the Supreme Court explained in *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008), such claims are preempted by the Federal Aviation Administration Authorization Act of 1994, which prohibits states from enacting or enforcing any law "related to" the rates, routes, or services of a motor carrier with respect to the transportation of property. In *Rowe*, the Court applied preemption to a state law requiring carriers to inspect packages for tobacco products and ensure customers were legally authorized to receive them. The Supreme Court had no trouble finding that law preempted, and this Court should do the same here, for the same reason.

Second, Plaintiffs' negligence and intentional infliction of emotional distress ("IIED") claims seek to expand tort liability beyond recognizable limits and fail as a matter of Texas law, independent of preemption. With their negligence claims, Plaintiffs seek to impose a duty on UPS to screen for and prevent delivery of virtually any article that an independent bad actor could use to cause harm. With their IIED claim, Plaintiffs also seek to impose liability on UPS for delivering

an item used to commit a crime, no matter that UPS is not alleged to have had any knowledge of what it carried or the third party's intent. Texas law does not recognize such claims.

For these reasons, as set forth further below, Plaintiffs fail to assert viable claims against UPS. Accordingly, UPS respectfully requests that the Court grant its motion to dismiss.

## BACKGROUND

### A.    UPS's Requirements for Transporting Firearms.

As referenced in the Second Amended Complaint, UPS provides transportation service to its customers pursuant to contractual terms and conditions. (ECF No. 24 ("SAC") ¶ 19.) In the United States, that agreement (from which Plaintiffs quote in Paragraph 19 of the SAC, for instance) is the UPS Tariff/Terms and Conditions of Service ("UPS Tariff/Terms"). The UPS Tariff/Terms provides that UPS accepts lawful firearm shipments, subject to terms and conditions.

Those terms and conditions are modeled on federal law. By way of example, the UPS Tariff/Terms uses the same definition of "firearm" as Congress adopted in the Gun Control Act of 1968 and the National Firearms Act of 1934. (UPS Tariff/Terms § 3.7.1); 18 U.S.C. § 921(a)(3) & 26 U.S.C. § 5845(a).[1] Additionally, as explained in section 3.7.1 of the UPS Tariff/Terms, UPS only accepts firearm shipments to, from, or between a federal firearms licensee or government agency, which again is modeled on federal requirements for interstate firearm shipments. *See,*

---

[1] A copy of the UPS Tariff/Terms that was in effect during the relevant period referenced in the SAC is attached as Exhibit A to the Declaration of Caitlin Sinclaire Blythe ("Blythe Declaration"). That version went into effect on December 27, 2021 and was available on the ups.com website at the time of the Robb Elementary attack in May 2022. (*Id.* ¶ 3.) When ruling on a motion to dismiss, "courts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A document referenced in but not attached to a complaint is incorporated by reference if it is "central to [the plaintiffs'] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Here, Plaintiffs rely on and quote from the UPS Tariff/Terms to support their claims. (*See* SAC at ¶¶ 3, 19.) Given that Plaintiffs treat the UPS Tariff/Terms as central to their claims, they may be considered at the pleading stage.

*e.g.*, 18 U.S.C. § 922(a)(2)(A) (permitting interstate firearm shipments between federal licensees, to federal licensees, and from federal licensees).  As even Plaintiffs concede in the SAC, the UPS Tariff/Terms requires customers—who are in the best position to know what their packages contain and whether the end-receiver is legally able to receive them—to ensure that any package containing a firearm complies with all federal, state, and local laws applicable to the customer, the recipient, and the package, including laws applicable to age limitations.  (UPS Tariff/Terms § 3.7.1; SAC ¶ 19.)  Similarly, when customers ship a firearm, UPS requires them to select an "Adult Signature Required" service, which requires a signature from a person over the age of 21 upon delivery.  (*Id.*)  The UPS Tariff/Terms also incorporates by reference additional guidelines on the ups.com website, which explain, by way of example, that UPS does not accept automatic weapons (i.e., machineguns).  (*Id.* (citing "'How to Ship Firearms' Guidelines"[2]).)[3]

   If an item, such as a firearm component or part, does not count as a "firearm" under federal law, then it is not a "firearm" under the UPS Tariff/Terms either.  (UPS Tariff/Terms § 3.7.1.)  But even then, the UPS Tariff/Terms requires customers to ensure that every package—no matter what it contains—is lawful to transport.  (*Id.* § 3.3 ("It is the responsibility of the Shipper" to ensure lawfulness.).)

---

[2] A copy of the "How to Ship Firearms" webpage as it appeared on ups.com during the relevant time period referenced in the SAC is included as Exhibit B to the Blythe Declaration.

[3] Plaintiffs also quote from terms and conditions in effect in the United Kingdom (available at https://www.ups.com/assets/resources/webcontent/en_GB/terms_carriage_eur.pdf), which prohibit customers from tendering packages that would be dangerous to transport, but fail to allege how UPS's United Kingdom terms are relevant.  (SAC ¶ 3.)  In any event, the referenced terms prohibit *customers* from transporting certain items.  They do not, as Plaintiffs appear to suggest, reflect any promise to screen packages to locate potentially dangerous items.

B.        The Allegations in the Second Amended Complaint.

According to the SAC, the attacker purchased a firearm and a trigger device from distinct third parties and then allegedly used those devices to perpetrate an attack on Robb Elementary. (SAC ¶¶ 13, 29.)  Plaintiffs allege based on "information and belief" that the trigger device seller shipped that item to the attacker via UPS.  (*Id.* ¶ 29.)[4]  Plaintiffs compare the trigger device to a "bump stock" and conclude that it therefore is "illegal" in Texas.  (*Id.* ¶ 30.)  Plaintiffs do not provide a factual basis to support that conclusion but, to the extent they equate the trigger device with a bump stock to infer that it qualifies as a "machinegun" under federal law, that inference is foreclosed by controlling authority.  *See Garland v. Cargill*, 602 U.S. 406, 423 (2024) ("We conclude that a semiautomatic rifle equipped with a bump stock is not a 'machinegun' because it does not fire more than one shot 'by a single function of the trigger.'"); *Cargill v. Garland*, 57 F.4th 447, 451 (5th Cir. 2023) (en banc) ("The definition of 'machinegun' as set forth in the National Firearms Act and Gun Control Act does not apply to bump stocks.").

Plaintiffs further allege that the attacker was "under 18" when he purchased the trigger device, (SAC ¶ 17), but fail to point to a law setting a minimum age at which a person can possess a firearm part.  Plaintiffs also assert that the attacker's home was located within 1,000 feet of Robb Elementary (*id.*), but again fail to point to a law making it unlawful to deliver a firearm part to a private address located in certain proximity to a school.[5]

---

[4] In a separate lawsuit against the trigger device manufacturer, Plaintiffs allege that a different carrier transported the trigger device.  *Albarado v. Daniel Defense, LLC*, No. 2:24-cv-00068, ECF No. 1-3 (W.D. Tex. June 28, 2024) ("Exhibit A-2 to Notice of Removal") (alleging the "trigger system was transported via FedEx Ground Service who facilitated the transfer to the shooter").

[5] Plaintiffs cite to 18 U.S.C. § 922(q), which prohibits possession of a "firearm" in a "school zone." But a school zone does not include "private property not part of school grounds."  18 U.S.C. § 922(q)(2)(B).  In any event, the only firearm at issue in the SAC is alleged to have been delivered via FedEx to a federal firearms licensee, not to the attacker at his home.  (*See, e.g.*, SAC ¶ 36.)

Without citing to any factual or legal basis to support such a duty, Plaintiffs generally assert that carriers such as UPS and FedEx owe "a duty of ordinary care to the public generally" not to transport "dangerous devices to minors; and/or to persons who have the indicia of mental illness." (*Id*. ¶ 34.)  According to Plaintiffs, carriers have a duty to "properly screen packages" to prevent the transportation of potentially dangerous or unlawful items and to provide corresponding training to employees.  (*Id.* ¶ 31.)  As part of that duty, Plaintiffs further contend carriers must inquire into what each package will be "used for" by the end-recipient, as well as the recipient's fitness to receive the package.  (*Id.* ¶¶ 29, 35, 37, 39.)

By contrast, Plaintiffs do not allege UPS had any contractual or other relationship with the attacker, that UPS knew or had reason to know of the attacker's intentions, or even that UPS knew that it was transporting a trigger device.  Plaintiffs also do not allege that UPS breached any contractual terms, including those described above, or even directly allege that one of its customers did so.  Nor do Plaintiffs plausibly allege that UPS violated any obligation federal law imposes on carriers.  Rather, through their state-law tort claims, Plaintiffs seek to impose additional and significant requirements—such as inspecting and performing a legal analysis of the contents of every package and, in addition, investigating the end-recipient's age, mental health, and intended use of every item shipped—that neither UPS's shipping contract nor any applicable law requires. In short, Plaintiffs seek to use state tort law to change the way UPS provides transportation service.

Plaintiffs assert state-law claims against UPS for common law negligence and negligence per se, gross negligence, and intentional infliction of emotional distress. [6]  (*Id.* ¶¶ 17, 41, 46-62.)

---

[6] In conclusory fashion, the SAC makes passing reference to purported "RICO" violations (e.g., SAC ¶¶ 33, 77), but does not assert a RICO claim, nor can the allegations plausibly be read to assert such a claim.  As set forth herein, such legal conclusions are not entitled to a presumption of truth.

They seek multiple categories of economic and noneconomic damages, punitive/exemplary damages, pre- and post-judgment interest, and attorney fees. (*Id.* ¶¶ 63-66, 82.)

### C.     Procedural History

In May 2024, Plaintiffs commenced an action in Bexar County District Court. (ECF No. 1-1.) On July 9, 2024, UPS removed the action to this Court (ECF No. 1) and answered the Complaint (ECF No. 3). At the time of removal, UPS had not been served. Plaintiffs have sought and obtained leave to amend their complaint multiple times. Most recently, Plaintiffs filed the SAC on October 17, 2024. (ECF No. 24.)

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard requires more than allegations "merely consistent with" relief. *Twombly*, 550 U.S. at 556. Rather, the complaint must "possess enough heft to show that the pleader is entitled to relief." *Id*. (cleaned up). And it must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a complaint has reached this "plausibility threshold," *Doe v. Robertson*, 751 F.3d 383, 390 (5th Cir. 2014), any legal conclusions, including those "couched as a factual allegation," are not entitled to any presumption of truth. *Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020). Dismissal is proper "not only when the plaintiff fails to plead sufficient facts to support a cognizable legal theory, but also when the plaintiff fails to allege a cognizable legal theory [at all]." *Liserio v. Newrez LLC*, No. SA-19-CV-01486-JKP, 2020 WL 1958637, at *1 (W.D. Tex. Apr. 23, 2020). "A complaint lacks an 'arguable basis in law' if it is based on an indisputably

meritless legal theory or a violation of a legal interest that does not exist." *Residents Against Flooding v. Reinvestment Zone No. Seventeen, City of Houston, Texas*, 260 F. Supp. 3d 738, 756 (S.D. Tex. 2017), *aff'd sub nom.*, 734 Fed. Appx. 916 (5th Cir. 2018) (quoting *Ross v. State of Texas*, No. H-10-2008, 2011 WL 5978029, at *8 (S.D. Tex. Nov. 29, 2011)). Finally, a court may dismiss a complaint if the causes of action are preempted by federal law. *See, e.g.*, *Ezell v. Kansas City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017) ("Whether a state statute or common law cause of action is preempted by federal law is a question of law . . . .").

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Through the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), Congress barred any state law claims "related to a price, route, or service" of a motor carrier with "respect to the transportation of property."  49 U.S.C. § 14501(c)(1) (motor carriers); *see also* 41713(b)(4)(A) (air and intermodal air/ground carriers).  Plaintiffs' state law claims, which seek to dictate how UPS handles the packages it transports, strike at the heart of what Congress intended to preempt through the FAAAA and should be dismissed.

### A.    The FAAAA Applies to Plaintiffs' State-law Tort Claims.

The FAAAA was modeled on predecessor legislation deregulating the air carrier industry, the Airline Deregulation Act ("ADA"), and courts addressing the FAAAA look to precedent interpreting both statutes.  Thus, any discussion of the FAAAA necessarily begins with the ADA. In 1978, Congress enacted the ADA to deregulate the air carrier industry.  *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 367-68 (2008).  The ADA's preemption provision prohibits a state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of

law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b)(1).

In *Morales v. Trans World Airlines, Inc.*, the United States Supreme Court explained that the ADA's preemption provision has a "broad" "ordinary meaning" and "express[es] a broad pre-emptive purpose."  504 U.S. 374, 383 (1992).  As a result, a state law may be preempted "even if the law is not specifically designed to affect" air carrier rates, routes, or services, even if "the effect is only indirect," and even if the "state and federal law are consistent."  *Id.* at 386.  In short, "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted."  *Id.* at 384.  Adopting this broad construction, the Supreme Court held that the ADA preempted enforcement of state consumer protection laws imposing guidelines regarding airline advertising, both because the guidelines made "express reference to fares" and because their enforcement would have a "forbidden significant effect upon fares."  *Id.* at 388.

The Supreme Court held again in *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 226-28 (1995), that the ADA preempted enforcement of generally applicable consumer protection laws, which in that instance were being used to hold carriers liable for modifications to their frequent flier programs.  *Wolens* carved out a single exception to preemption—which is inapplicable here— for "routine breach-of-contract claims" that enforce the "parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement."  *Id.* at 232-33.

And in *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 281 (2014), the Supreme Court clarified that the scope of ADA preemption is not limited to "legislation enacted by a state legislature and regulations issued by a state administrative agency."  To the contrary, "the phrase 'other provision having the force and effect of law' includes common-law claims," too.  *Id.* at 284.  Finally, while claims that have only a "tenuous, remote, or peripheral" connection with prices, routes, or services

may avoid preemption, "one must move quite far afield to confidently reach that limit." *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 435-36 (1st Cir. 2016); *see also Onoh v. Northwest Airlines, Inc.*, 613 F.3d 596, 599 (5th Cir. 2010).

In 1994, "Congress sought to 'level the playing field' between air carriers and motor carriers so that both could benefit from federal deregulation." *Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 818 (3d Cir. 2019) (quoting H.R. Conf. Rep. No. 103-677, at 88 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1715, 1754). Congress thus enacted the FAAAA to provide that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Congress modeled the FAAAA's preemption provision on the ADA's preemption provision. *Rowe*, 552 U.S. at 370. In doing so, Congress did "not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in *Morales*" for the FAAAA's parallel preemption provision. H.R. Conf. Rep. No. 103-677, at 83, 1994 U.S.C.C.A.N. at 1755. Courts thus look to both FAAAA and ADA precedent when interpreting language common to both statutes. *See Rowe*, 552 U.S. at 370.

Application of the preemption provision to tort claims, like Plaintiffs' claims here, is consistent with the purpose of the FAAAA because "applying the conflicting tort principles of 50 different states to these interstate and international transactions would make a mess of things." *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 607 (7th Cir. 2000). For that reason, and as set forth below, courts have not hesitated to preempt state-law tort claims that strike at the core transportation services carriers like UPS provide, like Plaintiffs' claims do here.[7]

---

[7] UPS is a motor carrier. 49 U.S.C. § 13102(14) ("motor carrier" means "a person providing motor vehicle transportation for compensation"); *see also Data Mfg., Inc. v. United Parcel Service, Inc.*,

**B.    Plaintiffs' Claims Relate to UPS's Prices, Routes, and Services.**

Plaintiffs' state law claims indisputably "relate to" UPS's prices, routes, and services within the meaning of *Morales* and *Rowe* and certainly would have a prohibited "significant impact." *Morales*, 504 U.S. at 383, 388.  Indeed, the *Rowe* Court found state law claims whose application was nearly identical to Plaintiffs' claims preempted.  This Court should do the same.

In *Rowe*, the Supreme Court held that Maine laws regulating the delivery of tobacco products were preempted because they related to motor carriers' "price[s], route[s], or service[s]." 552 U.S. at 368.  The first provision required tobacco shippers to engage a carrier who would check that package recipients matched the addressee and were of legal age to receive tobacco products.  *Id.*  The second provision prohibited the knowing transportation of tobacco to or from anyone who lacked appropriate licensing.  *Id.*  As the Court explained, the first provision would effectively require carriers "to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate."  *Id.* at 372.  And the second law would impose liability for carriers' "*failure sufficiently to examine every package.*"  *Id.* at 373 (emphasis in original).  Indeed, to avoid liability, the Court reasoned that carriers would need "to check each shipment" for tobacco products.  *Id.*  Thus, the Court held that these provisions regulated "the essential details of a motor carrier's system for picking up, sorting, and carrying goods—essential details of the carriage itself."  *Id.*  Accordingly, the Court concluded that each law related to carriers' prices, routes, or services and was preempted by the FAAAA.

Here, Plaintiffs invoke state law to impose similar—and, arguably, more extensive— obligations on UPS than the State of Maine did in *Rowe*.  Like the Maine laws seeking to prevent

---

557 F.3d 849 (8th Cir. 2009) (holding state law claims asserted against UPS were preempted by FAAAA); *Barber Auto Sales, Inc. v. United Parcel Service, Inc.*, 494 F. Supp. 2d 1290, 1293-94 (2007) (same).

tobacco shipments to minors, Plaintiffs seek to prevent certain individuals from possessing firearm parts. According to the SAC, UPS and other motor carriers like it have a duty under Texas tort law to "properly screen" packages to prevent potentially dangerous items from traveling into the state. (*Id.* ¶ 31.) In addition, according to Plaintiffs, carriers also must inquire into the age and mental health of recipients to confirm how they intend to use the item shipped and that they possess the maturity to do so. (*Id*. ¶¶ 29, 34.) Like the Maine laws, which effectively required carriers to "examine" packages and verify the age of recipients, Plaintiffs seek to compel UPS to provide a service—screening all packages and recipients—that it does not provide. Given the volume of packages that carriers like UPS handle every working day, the task of opening and inspecting every package and then investigating the eligibility of the intended recipient to receive it would be staggering, potentially grinding operations—and interstate commerce—to a halt.

Accordingly, as in *Rowe*, Plaintiffs seek to "directly regulate[] a significant aspect of [a] motor carrier's package pickup and delivery service" and "require carriers to offer a system of services that the market does not now provide." *Id.* at 372-73. Moreover, permitting suits like Plaintiffs' would impermissibly "freeze into place services that carriers might prefer to discontinue in the future." *Id.* "[I]n this way it creates the kind of state-mandated regulation that the federal Act pre-empts." *Id.* at 373. Indeed, "[t]o allow [Plaintiffs] to insist that [motor] carriers provide special checking systems [for certain types of items and recipients] would allow other states to do the same" and "could easily lead to [the] patchwork" of laws that the FAAAA sought to prevent. *Id.* at 373. Just as was true in *Rowe*, Plaintiffs' claims both "relate to" UPS's services and prices and also would have a significant impact on them.

Courts apply FAAAA preemption to claims related to carriers' prices, routes, or service even when the plaintiff seeks recovery for personal injury based on common law claims. In

*Rockwell v. United Parcel Serv., Inc.*, No. 2:99-CV-57, 1999 WL 33100089, at *2 (D. Vt. July 7, 1999), for example, the plaintiff asserted state law claims against UPS for delivering a package containing a pipe bomb that injured the plaintiff and killed her son. *Id*. at *1. Just as Plaintiffs do here, the plaintiff in *Rockwell* alleged that UPS had a "legal duty to inspect packages they deliver or a duty to warn customers of package contents." *Id*. The court dismissed the plaintiff's various state law tort claims as preempted by the FAAAA, concluding that "the claims against UPS go to 'the heart of the services that [UPS] provide[s].'" *Id*. at *2-3, *4 (citation and internal quotation marks omitted). As the *Rockwell* court explained:

> In the context of delivering packages, Ms. Rockwell's complaint regarding UPS's package intake and delivery protocol is, beyond purview, inherently a claim against UPS's services which is also preempted. Tort claims regarding a carrier's shipment of packages "would affect [its] provision of air shipment services" and are thus preempted.

*Id*. at *2 (citations omitted). As *Rockwell* noted, to hold otherwise would subject UPS to "a hodgepodge of state laws which would mandate various obligations upon UPS" to protect the public from potentially dangerous packages—a result that "would necessarily impact directly upon UPS's services and pricing," and which is thus preempted by the FAAAA. *Id*. at *3.

In *Soly v. UPS*, the court reached the same conclusion where a plaintiff asserted state law claims for negligent and intentional infliction of emotional distress based on UPS's delivery of packages that appeared to be contaminated with Anthrax. 02-CV-10499-MEL, 2002 U.S. Dist. LEXIS 24059, at *1 (D. Ma. Aug. 22, 2002). The plaintiff alleged a UPS employee told him that two packages with "a white powdery substance on them" would be delivered to him and that the employee had been told by supervisors to "go home and get tested for exposure to Anthrax." *Id*. at *1-2. The plaintiff further alleged that although he refused the packages when they were brought to him, "[t]he UPS employee who delivered the packages left them anyway," causing the plaintiff "severe emotional distress." *Id*. at *2. The *Soly* court dismissed the plaintiff's state law tort claims

as preempted by the FAAAA because they "[did] not merely 'relate to' UPS services, they ar[ose] directly from core services provided by UPS, going to 'the heart of the services that [UPS] provides.'" *Id.* at *3 (citation and quotation omitted).

Courts within the Fifth Circuit are in accord. Applying *Rowe*, courts have not hesitated to dismiss common law tort claims, such as negligence, that "seek to enforce a duty of care related to . . . the very 'services' [a defendant] provides" as defined in the FAAAA. *Zamorano v. Zyna LLC*, No. SA-20-CV-00151-XR, 2020 WL 2316061, at *3, *5 (W.D. Tex. May 11, 2020) (negligence claim preempted because "defendant's only role in the [incident] was [in its capacity] as a broker"); *see also Ragar Transp., Ltd. v. Lear Corp.*, No. 5:17-CV-52, 2021 WL 4502316, at *11 (S.D. Tex. Sept. 30, 2021) (negligent misrepresentation claim preempted because it "necessarily concern[ed] [defendant's] transportation of property and how that transportation was billed"). Plaintiffs' claims plainly "relate to" UPS's prices and services and are preempted.

## II.   PLAINTIFFS' NEGLIGENCE CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs' claims for common law negligence, negligence per se, and gross negligence all fail as a matter of law, for reasons independent of preemption.

"Under Texas law, negligence consists of four essential elements: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty; (3) an actual injury to the plaintiff; and (4) a showing that the breach was the proximate cause of the injury." *Skipper v. United States*, 1 F.3d 349, 352 (5th Cir. 1993). Negligence per se depends on breach of a duty of care imposed by statute. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 298 (Tex. 2020). In addition, gross negligence requires that the action causing the injury "involve[d] an extreme degree of risk" and that the defendant had "actual, subjective awareness of the risk" but was "conscious[ly] indifferent." *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019). Plaintiffs fail to plausibly

allege necessary elements of negligence (whether based on common law negligence or negligence per se), much less gross negligence.

### A.    Plaintiffs Fail to Identify a Legally Recognized Duty.

Whether framed as common law negligence or negligence per se, Plaintiffs fail to plausibly identify a legal duty.  Whether a duty exists is a question of law and liability will not be imposed if no duty is owed.  *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998).  Courts weigh the risk, foreseeability, and likelihood of injury against the social utility of the conduct in question, the magnitude of the burden to guard against the injury, and the consequence of placing such burden on the defendant.  *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

In support of their common law claim, Plaintiffs allege that UPS owed "a duty of ordinary care to the public generally" to "properly screen packages" to prevent the transportation of potentially dangerous devices to "to minors; and/or to persons who have the indicia of mental illness."  (SAC ¶¶ 31, 34.)  Said another way, Plaintiffs allege that carriers like UPS have a generalized duty to prevent "mass murder" by screening for potentially dangerous contents.  (*Id.* ¶ 36, 39.)  Under Texas law, however, it is well established that there is no duty to protect others from a third party's criminal conduct unless the criminal conduct was the foreseeable result of the defendant's negligence.  *Centeq Realty v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *see also San Benito Bank & Tr. Co. v. Landair Travels*, 31 S.W.3d 312, 321 (Tex. App.—Corpus Christi 2000, no pet.) (holding there is no duty to the general public to protect it from criminal conduct even where defendant had firsthand knowledge of third party's criminal propensity for theft).

The circumstances in which Texas courts have recognized such a duty are limited, typically to premises liability claims, where a landowner controls the premises and the law thus recognizes an obligation to protect against foreseeable criminal acts on the property, or where the defendant

has a special relationship with the criminal actor, giving rise to a duty to exercise control over foreseeable acts. *See, e.g.*, *LaFleur v. Astrodome-Astrohall Stadium Corp.*, 751 S.W.2d 563, 565 (Tex. App. 1988) ("Most cases discussing tort liability for another's criminal act(s) share a common circumstance, that is, the criminal act for which the negligent defendant is sued occurs on the defendant's premises."); *Phillips*, 801 S.W.2d at 525 (discussing special relationships, such as parent-child or employer-employee, that can give rise to a legal duty). No such circumstances are alleged here. Plaintiffs do not allege—nor could they—that UPS had any control over the premises where the attack occurred such that a duty to protect against third party criminal acts could be imposed. Nor do Plaintiffs allege a special relationship between UPS and the attacker.

Moreover, Plaintiffs do not allege *any facts whatsoever* to support an inference that the attack was somehow foreseeable to UPS. For example, Plaintiffs do not allege that UPS knew it was transporting a trigger device. Similarly, Plaintiffs do not allege that UPS had *any* relationship with the receiver beyond allegedly delivering a package to his home, much less that UPS knew the receiver's age, mental state or intentions. Rather, Plaintiffs simply conclude that a carrier has a general duty to prevent a package receiver from using an item to cause harm. But that is not and cannot be the law. If it were, it would render a carrier liable in tort for virtually any criminal act, so long as the carrier transported an item later used by a package recipient to commit a crime. Courts routinely reject such applications of tort law and this Court should do the same. *See, e.g.*, *Rockwell*, 1999 WL 33100089, at *4 (concluding that just as "UPS has no duty to control the conduct of others, it follows that it does not have a duty [to] inspect its customers['] packages for dangerous contents" under Vermont law "or in any other jurisdiction"); *cf. Golden Spread Council, Inc. No 562 of Boy Scouts of America v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996) (holding that Boy Scouts of America did not owe a duty to screen the criminal history of adult volunteers).

As to negligence per se, Plaintiffs' attempt to rely on Section 46.14 of the Texas Penal Code to create a duty fares no better. As an initial matter, Texas law restricts the types of criminal statutes that give rise to civil tort liability. *Reeder v. Daniel*, 61 S.W.3d 359, 361-362 (Tex. 2001). UPS is not aware of any Texas court that has held that section 46.14 gives rise to a legal duty for purposes of civil tort law. But even assuming for the sake of argument that it could, Plaintiffs have not alleged that UPS fell short of any obligations set forth by the Penal Code. Section 46.14 provides, in relevant part, that a person may not "knowingly engage[] in the business of transporting or transferring a firearm that the person knows was acquired in violation of the laws of any state or the United States." TEX. PENAL CODE § 46.14. Here, Plaintiffs allege only that UPS shipped a trigger device. (SAC ¶ 28.) As an initial matter, the statute defines "firearm" in a way that does not extend to parts or components. *See id.* § 46.01(3) ("'Firearm' means any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use."). Transporting a part or component would not violate the statute. Similarly, Plaintiffs do not even allege that UPS knew or had any reason to know that it was transporting an unlawful item, which also forecloses any application of negligence per se.

### B.    Plaintiffs Also Fail To Plausibly Allege Causation.

Plaintiffs' negligence claims also fail because Plaintiffs have not alleged facts sufficient to infer that UPS proximately caused their injuries. Proximate cause is comprised of both cause in fact and foreseeability. *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1054 (5th Cir. 1992) (applying Texas law). Cause in fact is established if the alleged act or omission was a substantial factor in bringing about injury, without which the harm would not have occurred. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985). Merely furnishing a condition that makes the

injury possible, by contrast, is not sufficient. *Doe v. Boys Clubs*, 907 S.W.2d 472, 477 (Tex. 1995). Foreseeability is established "if a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Nixon*, 690 S.W. 2d at 549-550.

Here, Plaintiffs have not alleged facts sufficient to infer that the attacker's criminal conduct was foreseeable. As discussed in Section II.A., *supra* at 15-17, Plaintiffs do not allege that UPS knew or had any reason to know of the attacker's intentions, or even that UPS knew it was allegedly transporting a trigger device. As with other carriers, UPS generally does not have knowledge of the specific contents of packages that enter its network. However, even if Plaintiffs could allege that UPS knew it was shipping the trigger device and knew the receiver was a minor (facts Plaintiffs do not allege), that still would not render the attacker's crime foreseeable. Plaintiffs would have to allege it was foreseeable that the receiver would break the law, something Plaintiffs have not done. *See Holder v. Bowman*, No. 07-00-0126-CV, 2001 WL 62596, at *5 (Tex. App.—Amarillo Jan. 25, 2001, pet. denied) (noting that it is generally acceptable to "assume that a minor will act in a law abiding manner"); *Cowart v. Kmart Corp.*, 20 S.W.3d 779, 785 (Tex. App.—Dallas 2000, pet. denied) (holding that a defendant who sold ammunition to a seventeen-year-old could reasonably assume they were old enough to obey the law and "appreciate the danger of negligent or intentional misuse of ammunition"); *Chapman v. Oshman's Sporting Goods, Inc.*, 792 S.W.2d 785 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (negligence claims survive only if there is evidence that the purchaser's criminal conduct was foreseeable).

Because Plaintiffs have not and cannot allege that the attacker's criminal conduct was foreseeable to UPS, such acts constitute a superseding independent cause that destroys any causal connection with the alleged negligent conduct Plaintiffs claim resulted in their injury. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016). Texas courts dealing with negligence claims in

connection with the sale of firearms and ammunition routinely hold that a third party's criminal conduct is indeed a superseding cause, even as to the *seller*. *See e.g.*, *Holder*, 2001 WL 6596, at *3-4; *Cowart.*, 20 S.W.3d at 785; *Chapman*, 792 S.W.2d at 788. Here, UPS allegedly acted only as the common carrier who transported the item. UPS thus is located even further down the causal chain than the seller of the trigger device.

Plaintiffs' negligence claim should be dismissed for this independent reason because no plausible causal relationship exists between UPS and Plaintiffs' alleged harm.

### C.    Plaintiffs Also Fail To Plausibly Allege Gross Negligence.

Finally, because Plaintiffs have failed to sufficiently plead a claim for negligence, by definition, Plaintiffs cannot satisfy the heightened standard to assert a claim for gross negligence, which requires that the action causing the injury "involve[d] an extreme degree of risk" and that the defendant had "actual, subjective awareness of the risk" but was "conscious[ly] indifferent." *Medina*, 593 S.W.3d at 247. Plaintiffs do not plausibly allege any facts to support such a claim.

In addition, under Texas substantive law, an award of punitive damages requires a finding of gross negligence. TEX. CIV. PRAC. & REM. CODE § 41.003(a)(3); *Bennett v. Reynolds*, 315 S.W.3d 867, 849 (Tex. 2010). Because Plaintiffs' claim for gross negligence fails, there is no predicate basis for awarding punitive damages.

## III.    PLAINTIFFS' IIED CLAIM FAILS AS A MATTER OF LAW.

To bring an IIED claim, Plaintiffs must allege "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017). Emotional distress must be the intended or primary consequence to be actionable. *Standard Fruit & Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62,

68 (Tex. 1998). Moreover, the conduct in question must be so outrageous in character and extreme in degree so as to exceed all possible bounds of decency and be atrocious and utterly intolerable. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).

Here, Plaintiffs do not allege facts to support their IIED claim beyond what they allege in support of negligence. (*See, e.g.*, SAC ¶¶ 55, 59.) Specificity is vital because "[m]eritorious claims for intention infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). The dearth of any factual allegations to support the IIED claim are fatal. It simply is not possible to allege a viable IIED claim based on merely delivering a package, without knowledge of its contents or the receiver's intentions, which is all UPS is alleged to have done here.

## CONCLUSION

UPS respectfully requests that the Court dismiss Plaintiffs' claims. Because amendment would be futile given that federal law preempts Plaintiffs' claims, and given that Plaintiffs already have amended the Complaint multiple times without curing its defects, UPS respectfully asks for dismissal without leave to amend. *See, e.g.*, *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (recognizing district court's discretion to deny leave to amend based on futility of amendment or failure to cure deficiencies by amendments previously allowed).

Dated: October 30, 2024                           Respectfully Submitted,


*/s/ Lauren A. Valkenaar* _____
Lauren A. Valkenaar
Texas State Bar No. 24088570
lvalkenaar@valkenaarlaw.com
Dylan R. Fedderman
Texas State Bar No. 24105851
dfedderman@valkenaarlaw.com
VALKENAAR PLLC
7898 Broadway, Suite 120
San Antonio, Texas 78209
Telephone: (210) 239-0321
Facsimile: (210) 634-2566

Caitlin Sinclaire Blythe
CA State Bar No. 265024
cblythe@mofo.com
MORRISON & FOERSTER LLP
425 Market St.
San Francisco, California 94105
Telephone: (415) 268-6463
Facsimile: (415) 268-7522


*Attorneys for Defendant*
*United Parcel Service, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record via e-Filing on this 30th day of October 2024.

/s/ Lauren A. Valkenaar
Lauren A. Valkenaar